## Case No. 15,816.

UNITED STATES v. MORRIS.

[1 Paine, 209.] [1]

Circuit Court, D. New York. Sept. Term, 1822. [2]

FORFEITURES — REMISSION — INFORMER'S SHARE — PLEADING AT LAW—DEPARTURE—PARTIES.

1. The secretary of the treasury has power, under the act for the mitigation and remission of forfeitures, to remit as well the moiety or share allowed to individuals as the part belonging to the government.

[Cited in U. S. v. Collier, Case No. 14,833. Followed in U. S. v. Hutchinson, Id. 15,-431.]

2. And a decree of condemnation or judgment has not the effect so to vest or consummate the rights of individuals, as to secure them against the exercise of this power.

[Cited in U. S. v. Collier, Case No. 14,833.]

3. There is no analogy between this power and the power of the king to pardon in England.

4. And it is a power wholly distinct from the constitutional pardoning power of the president.

5. Its object is to afford merited relief where courts of justice are obliged to inflict the penalty.

6. How far a court can regard the innocence of a party when the facts of a case subject it to the penalties of a statute, and especially of the collection law, quære.

[Followed in U. S. v. Hutchinson, Case No. 15,431.]

7. The word "prosecution," as it is used in the act for the remission of penalties, comprehends all the proceedings in a suit as well before as after judgment, including the execution.

8. As to the period at which the power of the secretary to remit ceases, quære.

[Cited in U. S. v. Collier, Case No. 14,833.]

9. But, it seems, not before the penalty has been collected and distributed.

10. Whether the secretary has the exclusive right to determine at what period he may legally remit, quære.

11. Departure in pleading defined.

12. A judgment had been recovered by the United States for a penalty, which was afterwards remitted. The marshal, to whom an execution was issued, had made a levy, but on being served with the warrant of remission, redelivered the goods to the debtors. An action was thereupon brought against him in the name of the United States for the moiety of the penalty allowed to the officers; but the declaration alleged no interest in them, but only in the United States. The defendant pleaded the remission. The plaintiff replied the interest of the officers. On special demurrer, held to be a departure.

[Cited in Rice v. Thayer, 105 Mass. 261.]

13. Whether an individual who has rights under a judgment of the United States can have a remedy for a violation of those rights, by a suit in the name of the United States, or

---

[1] [Reported by Elijah Paine, Jr., Esq.]
[2] [Affirmed in 10 Wheat. (23 U. S.) 246.]

must resort to an action for consequential damages in his own name, quære.

14. Whether an execution for the sole benefit of an individual, on a judgment of the United States, can be issued into any district of the United States as it might be if it were for their use, quære.

15. Whether an action can, in any case, be brought for an individual in the name of the United States, by any attorney other than the district attorney, he refusing to bring it, quære.

[Cited in Meister v. People, 31 Mich. 102.]

This was an action of trespass on the case, for the misfeasance of the defendant in discharging certain goods from a levy, which he had made as marshal of the Southern district of New York, under an execution issued upon a judgment of the plaintiffs, and restoring the goods so levied upon, to the debtors.

Before the commencement of the action, an order had been obtained from Mr. Justice LIVINGSTON, on an affidavit stating the cause of action, and that the district attorney of the United States for this district had refused to act as attorney in the suit, or allow his name to be used; appointing one of the attorneys of the court to prosecute the action for the plaintiffs.

The declaration stated the recovery by the plaintiffs of a judgment in the circuit court of the United States for the district of Maine, for 22,361 dollars and 75 cents, with costs of suit, at the September term in 1817, against Andrew Ogden, Abraham K. Smedes, and Thomas C. Butler, of New York, and that the same remained unsatisfied to the amount of 11,180 dollars and 87 cents. It was then alleged, that a writ of execution for this sum was issued upon the judgment, directed to the marshal of the district of Maine, or any other district of the United States, and was delivered to the defendant, as marshal of the Southern district of New York, who levied under it, and returned, that the goods levied upon remained in his hands for want of buyers. That, after a second execution had been issued, and a like return made, a venditioni exponas was issued and delivered to the defendant, who might have sold the goods levied upon for a sufficient sum to satisfy the execution, but that, instead of proceeding to sell according to the command of the writ, he re-delivered the goods to the debtors, Ogden, Smedes, and Butler.

The defendant pleaded the general issue, and a special plea, stating the following facts: That after the receipt by him of the venditioni exponas, Ogden, Smedes, and Butler produced and delivered to him two warrants of remission of the forfeiture, for which the judgment mentioned in the declaration was recovered, granted at different times by the secretary of the treasury pursuant to the statute of the United States, entitled "An act to provide for mitigating, or remitting the forfeitures, penalties, and disabilities accruing in certain cases therein mentioned," and dated, the one on the 9th

of February, and the other on the 17th of December, 1818. The warrants were set forth in hæc verba, and recited a statement of facts and petition which had been presented by Andrew Ogden and others to the district judge of the district of Maine, and by him transmitted, agreeably to the act for the remission of forfeitures, to the secretary of the treasury. The facts stated were, that the brig Hollon and her cargo, imported by Andrew Ogden into the district of Maine, had been forfeited under "An act to interdict the commercial intercourse between the United States and Great Britain and France and their dependencies, and for other purposes," and "An act concerning the commercial intercourse between the United States and Great Britain and France and their dependencies, and for other purposes," and the statute supplementary to the last mentioned act; and that on the seizure of the Hollon and cargo, Ogden, Smedes, and Butler had given their bond for their appraised value, on which a suit had been brought in the district court for the district of Maine. The warrants then proceeded to declare that the secretary of the treasury, having considered these circumstances, did, by the authority vested in him by the act for the remission of forfeitures, "remit to the petitioner, all the right, claim, and demand of the United States, and of all others whomsoever, to the said forfeitures, upon payment of the duties which would have been payable had the importation been lawful, and the costs and charges, and on payment of five hundred dollars to be distributed among the custom-house officers in the proportions prescribed by law." There was also an averment, that the judgment mentioned in the declaration was rendered upon a bond executed by Ogden, Smedes, and Butler to the United States, for the appraised value of the brig Hollon and a part of her cargo, by reason of the forfeiture mentioned in the warrants of remission. The defendant in his plea further alleged, that at the time he was so served with the warrants of remission, Ogden, Smedes, and Butler paid him the five hundred dollars therein specified, and the costs of the writs, which he, at the return of the venditioni exponas, paid into the registry of the district court for the district of Maine, and that the said Ogden, Smedes, and Butler had previously paid to the person authorized to receive the same, the duties required to be paid by the warrants of remission. That they thereupon demanded of him, that the said goods should be discharged from the levy, and restored to them; and that he did accordingly restore them, free from such levy, as he was bound to do. The plea then recited the return made by the defendant to the venditioni exponas, in which all the facts before stated in the plea were set forth in full.

To this plea the plaintiffs replied as follows: "And the said plaintiffs, as to the said

plea of the said defendant, say, that they ought not to be barred, &c. because, they say, that although true it is that the said William H. Crawford, as such secretary of the treasury of the United States, did make and issue the said warrants of remission, as in the said plea of the said defendant is alleged, yet for replication in this behalf, the said plaintiffs in fact say, that heretofore, to wit, at the time of the recovery of the judgments in the said declaration mentioned, and at the times of the issuing of the several executions thereon, and of their delivery to the said defendant, in said declaration mentioned, and at the times of the seizure, forfeiture, and condemnation of the brig Hollon, her tackle, apparel, and furniture, together with certain goods and merchandise hereinafter mentioned, and at the time of the making and issuing the said warrants of remission, and at the time of the service thereof on the said defendant, and of the payment to him of the sums of five hundred dollars, and of three dollars twenty-five cents by the said Ogden, Smedes, and Butler; and at the time of the said defendant's paying said two last mentioned sums of money into the registry of the said district court of the said United States of America, in and for the district of Maine; and at the time of the payment of the said duties, costs, and charges, by the said Ogden, Smedes, and Butler, as in the said plea mentioned, Isaac Ilsley was collector of duties on imports and tonnage for the district of Portland and Falmouth, in the said district of Maine, and James C. Jewett was surveyor of the said district of Portland and Falmouth; and the said Ilsley and Jewett being such collector and surveyor, the said Ilsley, under, and by virtue of his said office, on the fifth day of July, 1813, at Portland, in the said district of Portland and Falmouth, and on waters navigable from the sea in vessels of ten and more tons burthen, seized the said brig Hollon, said brig being a vessel of said United States, and owned by a citizen thereof, her tackle, apparel, and furniture, together with certain goods and merchandise, as forfeited to the said United States of America; for this, viz. that on a day prior to the day of seizure aforesaid, viz. on the first day of June, in the year aforesaid, at Liverpool, in Great Britain, the goods and merchandise aforesaid, the same being of the growth, produce, and manufacture of Great Britain, and articles, the importation of which into the said United States by the statutes thereof in such case made and provided then was prohibited, were put on board the vessel aforesaid, with intention of importing the same into the said United States, contrary to the true intent and meaning of the statutes aforesaid: and afterwards, to wit, on the said fifth day of July, the same goods and merchandise were accordingly so imported in the vessel aforesaid into the said United States, contrary to the statutes in such case made and provided as aforesaid. And the said plaintiffs further say, that the attorney for the

said United States, in and for the said district of Maine, afterwards, to wit, on the sixth day of July, in the year aforesaid, by the direction of the said collector, commenced a suit in the district court of the United States, in and for the said district of Maine, for the recovery of said forfeiture, by filing an information or libel in said court against the said brig, her tackle, apparel, and furniture, together with said goods and merchandise; and said suit having been so commenced, the said Ogden, Smedes, and Butler, afterwards, viz. on the nineteenth day of July, in the year aforesaid, in consideration of the restoration of said goods and merchandise to Andrew Ogden, the claimant thereof, did execute and deliver to the said United States their certain bond or writing, obligatory in the penal sum of forty thousand dollars, with condition, that if judgment should pass against the said claimant as to the whole of said goods and merchandise or any part thereof, and the said claimant should within twenty days thereafter pay into court, or to the proper officer thereof, the sum of 22,361 dollars and 75 cents, the appraised value of the said goods and merchandise, or such part thereof as should be decreed by law forfeited, with costs of prosecution, then the said bond or writing obligatory to be void and of no effect, but otherwise to remain in full force, power, and virtue. And the said plaintiffs further say, that afterwards, viz. on the twenty-seventh day of May, in the year 1817, it was considered and decreed by the said district court of the United States, in and for the said district of Maine, that the said brig Hollon, her tackle, apparel, and furniture, and the goods and merchandise aforesaid were by law forfeited; and that the said appraised value thereof, viz. the sum of 22,361 dollars and 75 cents should be paid into the said court, or to the proper officer thereof, in twenty days from the date of said decree, together with the costs of prosecution, taxed at 148 dollars and 92 cents. And the said plaintiffs further say, that more than twenty days afterwards, viz. at the September term of said court next following, the said claimants, Andrew Ogden and others, having failed to comply with the terms of the said decree, it was considered, adjudged, and decreed by the said court, that the said United States should recover against the said Ogden, Smedes, and Butler, the sum of 22,361 dollars and 75 cents debt or damage, and costs of suit taxed at 148 dollars and 92 cents, and that execution should issue accordingly. And the said plaintiffs aver, that the said last mentioned judgment, so recovered as aforesaid, is one and the same judgment with the judgment mentioned in the counts of the said plaintiffs' declaration in this suit, and no other. And the said plaintiffs also aver, that at the times of said seizure, forfeiture, and condemnation, and at the time of the rendition of said judgment, there was no naval officer of the United States in and for the district of Portland and

Falmouth aforesaid, and that such forfeiture was not recovered in pursuance or in consequence of information given to said collector, by any person other than the said surveyor of the said district of Portland and Falmouth And the said plaintiffs in fact say, that the said Ilsley and Jewett, collector and surveyor of the said district of Portland and Falmouth as aforesaid, were entitled, by the statute in such case made and provided, after deducting all proper costs and charges, to one moiety of the forfeiture so decreed and recovered as aforesaid, to be divided between them in equal proportions, to wit, to the sum of 11,-. 180 dollars 87 cents. And the said plaintiffs aver, that the writs of execution in the several counts of the said declaration mentioned, were sued and prosecuted out of the said district court, in and for the said district of Maine, solely for the purpose of obtaining and satisfying the said moiety of said forfeiture, to which the said Ilsley and Jewett were entitled as aforesaid; of which the said defendant had notice, to wit, &c. and that at the time of the delivery to the said defendant of the said writs of execution, in the several counts of the said declaration first respectively mentioned, two memorandums in writing were endorsed thereon, the one signed by William P. Preble, Esquire, the attorney of the said United States in and for the said district of Maine, notifying the said defendant that the said execution was for the benefit of the said collector and surveyor of the said district of Portland and Falmouth, and directing the said defendant forthwith to collect the same by their order; the other signed by the said Ilsley and Jewett, as collector and surveyor, requiring the said defendant forthwith to collect the said execution, and deposit the money agreeably to the precept thereof; and notifying the said defendant that the property in said execution was in them, the said Ilsley and Jewett, and requiring the said defendant to receive orders from them, the said Ilsley and Jewett, and from no other persons whatsoever in whatever related to the said execution. And the said plaintiffs in fact further say, that this suit was commenced in the name of them the said plaintiffs, for and on behalf of the said Ilsley and Jewett, and for the purpose of enabling the said Ilsley and Jewett to recover their damages for the injury they have sustained, by reason of the misfeasances of the said defendant in the said declaration mentioned, and not for the benefit, use, or behoof of the said plaintiffs, viz. &c.: and this the said plaintiffs are ready to verify. Wherefore they pray judgment and their damages by them sustained, by reason of the said misfeasances of the said defendant, to be adjudged to them," &c.

The defendant demurred generally to the replication, and also assigned the following special causes of demurrer: "And the said Thomas Morris, marshal as aforesaid, according to the form of the act in such case made and provided, states, and shows to the court now here, the following causes of demurrer in law to the said replication, that is to say, —for that the said replication is a departure from the said first count of the said declaration, in this, that the said first count proceeds upon a cause of action in favour of the United States of America; whereas the said replication proceeds upon a cause of action in favour of the said Ilsley and Jewett, in the said replication respectively named. And for that the said replication discloses no authority for the said Ilsley and Jewett to prosecute the said action against the said Thomas Morris, marshal, as aforesaid, in the name of the said the United States of America; and for that the said replication discloses no lawful and sufficient authority for the said Ilsley and Jewett to prosecute the said action against the said Thomas Morris, marshal, as aforesaid, in the name of the said the United States of America. And for that the said suit is prosecuted in the name of the said the United States of America, by an attorney on record, other than, and different from the attorney of the United States of America, for the Southern district of New York, who is appointed by law to prosecute all suits and proceedings in this court, for and on behalf of the said the United States of America; and for that the said replication is in other respects uncertain, informal, and insufficient," &c.

The pleadings concluded with a joinder in demurrer.

T. A. Emmet and J. Wells, in support of the demurrer, contended:

(1) That the replication was no answer to the plea, because the remission of the secretary of the treasury devested as well the rights of the custom-house officers as those of the United States. The words of the act give the secretary power to remit the whole penalty, without making any distinction between the interest of the United States and of the officers. It is a new power created by this statute, and is not to be governed by analogies, but by the plain words and meaning of the act itself. These are, that the secretary may remit the whole penalty, without fixing any period at which his power shall cease. It is true that the act authorizes him to direct any prosecution that may have been commenced for the penalty to be discontinued; and perhaps it may be gathered from this clause, to what time the legislature meant to limit the exercise of his power of remission. But the inference which is made from the word "prosecution" by the plaintiff's counsel is incorrect. The prosecution is not at an end until the money is collected on the execution and paid into court, and perhaps not until it has been paid over to the party. Until then he has no possession or enjoyment of his right, but is seeking it by the aid of the law, and this is a prosecution of it. In this case, however, no execution had been issued at the date of the first warrant of re-

mission, and at the date of the second a levy only had been made, and the goods remained in the hands of the defendant. The analogy of the king's and president's pardoning power does not apply. It is admitted, that were this a case of pardon, a judgment would have placed the rights of the officers beyond its operation. But the power of pardon exists in the king independently of any act of the legislature. It is a prerogative power, and to be controlled by those rules which have been established to prevent its conflicting with the powers of the legislature. On the other hand the secretary's power of remission is conferred on him by the same legislature from which the custom-house officers derive their rights. They who granted these officers their moiety of the forfeiture, had a right to provide, that under certain circumstances they should be deprived of it, and, in this case, they did so provide before their bounty was bestowed. Besides, the king's pardon is an act of mercy; it proceeds from his free grace, without being called forth by the merits of the offender. But the secretary's power was vested in him for an entirely different purpose. He cannot exercise it unless he is satisfied of the innocence of the applicant. The party who asks for it, is as much entitled to it, if innocent, as he would be to ordinary justice if in a court of law. The secretary of the treasury is constituted a tribunal to proceed on evidence, in a prescribed manner, for the purpose of supplying the defective powers of the courts. His power is analogous to that of a court of equity when revising the proceedings of a court of common law. The cases of Jones v. Shore, 1 Wheat. [14 U. S.] 467, and Van Ness v. Buel, 4 Wheat. [17 U. S.] 74, which are relied on to show that a condemnation vests the moiety of the officers so that it cannot be remitted, are not applicable here, as the interests of the parties there were entirly different. Besides, those cases decide no more than that the inchoate right of the collector, which arises upon seizure, becomes absolute by condemnation: but surely, not absolute so that the penalty cannot be remitted.

(2) The replication is a departure from the declaration. A departure is when the second plea does not contain matter pursuant to the former, and which does not fortify it. Doc. Plac. "Departure," 119; Keb. 124. And where general matter is pleaded at the commencement when the special matter might have been, the party shall not afterwards maintain the general matter with the special matter. Willes, 638; Doc. Plac. 121, 123; 3 Hen. VII. p. 5; 37 Hen. VII. p. 5; Co. Litt. 204a; Com. Dig. "Pleader," F, 8.

(3) The action is in a wrong name. The replication shows that the plaintiffs have no interest, and of course, no right of action. The custom-house officers had no right to sue in the name of the United States. Nor was there any necessity for it. If they have suffered a wrong by the conduct of the defendant, they could have brought an action in their own names for consequential damages.

(4) The statute which allows a writ of execution to be issued into another district, does so only where "the judgment is obtained for the use of the United States."

(5) By Judiciary Act, § 35, it is made the duty of the district attorney to prosecute all actions in which the United States shall be concerned.

J. O. Hoffman, H. Wheaton, and E. Paine for the United States, insisted:

(1) That the secretary of the treasury had no power to remit after condemnation. The words of the act may be considered as conclusive on this point. It authorizes the secretary, when a fine, penalty, or forfeiture shall have accrued, to remit such fine, penalty, or forfeiture, and to direct any prosecution that may have been instituted for the recovery thereof, to be discontinued. Here is a connected phraseology, every word of which applies to a state of things before judgment, but not after. If a judgment has been recovered, the fine, penalty, or forfeiture has become a debt, and is not included within the legal signification of these terms. Nor after judgment, would the word "accrue" be applicable to a forfeiture. The forfeiture has not then merely accrued, it has been recovered. Nor does a prosecution extend beyond the judgment. When that is recovered, the rights of the parties have become fixed and settled; the law ceases to exert itself judicially, and only acts ministerially in the various steps of an execution. Recovery, too, can only mean the recovery of the forfeiture by a judgment. It is a mistake to suppose, that these words, and especially the word recover, are to be undertsood in an ordinary or familiar, in contradistinction to a legal or technical sense. The subject to which they were applied is peculiarly a legal one, and the act is evidently the production of persons familiar with legal language. Such language, too, having a settled and specific meaning, would be preferred to words as used in their ordinary and uncertain acceptation. But the word "recovery" cannot, without violence, be made to mean any thing except a judgment. It is attempted to extend its signification to the act of the parties in receiving the penalty in the money realized under the execution. But this is not English in any sense. In common parlance, this would be called a receipt of the money, and not a recovery. A thing is ordinarily said to be recovered when the possession of it has been lost, but has been regained. And this is its only common signification. But in that sense, it could not have been used in this act. So that we are driven to the adoption of its legal or technical signification. And that can be nothing but the recovery of the judgment. Every subsequent step has its appropriate legal name. When the property is

seized under execution, it is said to be levied upon, but not recovered. When the money is paid into court by the officer, or paid over to the plaintiff, it is so said, but is never called a recovery of it. The connexion, too, of this word with the word "prosecution," proves that it was used in its legal sense. The last word "discontinued" can only apply to a suit before judgment. An execution is said to be stayed. As the power of the secretary, therefore, is conferred by language, which clearly contemplates a certain state of things, that power must cease, when such state of things is determined. But besides this manifest intention of the legislature, the operation of a judgment is such as to vest the rights of parties, and place them beyond the exercise of a power of this description. This has been expressly decided in the circuit court for the First circuit. The Margaretta [Case No. 9,072]; The Hollon [Id. 6,608]. And it has also been decided, as between successive collectors, that the right to the forfeiture becomes vested when judgment is recovered, and before the receipt and payment over of the money. Jones v. Shore [1 Wheat. (14 U. S.) 462]; Van Ness v. Buel [4 Wheat. (17 U. S.) 74]. It is the settled law of England, which must have been familiar to the framers of this act, that a pardon by the king does not affect the moiety of an informer, whose right has become vested by a judgment. 3 Inst. 233; 5 Coke, 51a; 3 Mod. 56; Cro. Car. 357, 358; 1 Salk. 233, 234; 3 Inst. 238; Strange, 1272; 5 Coke, 51b; Cro. Jac. 159; Cro. Car. 199; 5 Co. Litt. 51b; Cro. Car. 47; Parker, 280. So in prize proceedings, the crown cannot release captured vessels after condemnation. 5 C. Rob. Adm. 173. It is contended, not only that these analogies apply to this case, but that the legislature knowing the effect of a judgment in this respect, in the country from which we derive our legal maxims and principles, would, had they intended that such maxims and principles should not be applied, have expressly said so, when they were providing for a power of remission with reference to a pending prosecution.

(2) The causes of special demurrer, all depend on the main question, whether the secretary had power to remit the officers' moiety. If he had not, then that moiety stands exactly as it did before the remission. So much of the judgment of the United States remained unsatisfied, "whereof execution remained to be done." This moiety is, by the acts (Collection Law, §§ 89, 91; Laws U. S. c. 195, § 18; 4 Bior. & D. Laws, 217 [2 Stat. 532]; Laws U. S. c. 264, § 3; 4 Bior. & D. Laws, 306 [2 Stat. 606]) which allow it to the officers, vested in the United States, for the officers' benefit, until distribution be made. Those acts point out the course of its collection and distribution, and give the officers no right to it until that takes place. By the ninety-first section of the collection law, it is provided, that the moiety of the penalty shall be given to the collector, naval officer, and surveyor of the district; or, if there is but one of those officers, then to him; but if there was an informer, he is to have one-half the moiety, and the officers get only the other half. Here are rights to be settled and adjusted. And the eighty-ninth section directs the collector to make the distribution. It is referred to him exclusively, to determine who are the officers of the district, and whether there is an informer. Under these circumstances would not this court, had this action been brought in the names of the officers, have said, "you have no rights so settled that this court can determine what they are, or whether all the proper parties are before it. Perhaps there is an informer who should have been joined with you. Whether there is, is a question for the collector, or at least for the court where the judgment was recovered. The suit should have been brought in the name of the United States, who have the only right which this court can notice." If then, the secretary could not remit this moiety, the United States are not merely trustees for the officers, to obtain it for them, but they have a direct interest that their officers should receive it, as a part of their compensation. If the marshal neglects his duty, and does not levy under an execution upon the judgment, he is liable to those who have the legal property in the judgment, and to them only. The officers, besides, have something more conferred on them than the mere moiety of the forfeiture. They enjoy the right, by the express words of the statute, of having that moiety compounded with that of the United States, to be pursued in their name, and with all their privileges and advantages, until it be finally collected and distributed. The United States were thus bound to commence this action in their own names; the officers had a right to have it so commenced; and they could not have brought one in their own names. The action was, therefore, rightly brought in the name of the United States, and the execution was properly issued into the district of New York.

The cause of demurrer, that the replication is a departure from the declaration, because the latter proceeds on a cause of action, in favour of the United States, while the former proceeds on a cause of action in favour of the officers, is unfounded. The declaration discloses the true and complete cause and right of action, which is in the United States. The replication discloses no right of action in the officers. It merely states a right in them, wholly different from the right of action; to a moiety of the penalty when it shall be collected. The cause of action is the same in both pleadings. It was not necessary, and would have been improper to have stated this right in the declaration, when the cause of action there stated was sufficient without it. It could not then be anticipated that the present defence would necessarily have been

pleaded, even if such defence had been known. It was time enough to reply to such defence when made; and this is the proper and only office of the replication. The plea stated new matter, and the replication contains new matter in avoidance. To maintain this point of the defendant's counsel, they must establish the extraordinary principle, that the declaration should be encumbered with all such facts as are known to the plaintiff, which would be an answer to any possible defence that may also be known to him.

The last special cause of demurrer, viz. that none but the district attorney could bring the action, also depends on the main question. If the officers are entitled to their moiety, notwithstanding the remission, and to sue for it in the name of the United States, they ought not to be dependent on the pleasure of the district attorney, if he chooses to prejudge the case and to refuse to bring an action. In such case they would be remediless. The court must have power in a case of the kind to authorize another attorney to sue. The appearance by attorney, may be properly and safely left to be controlled by the rules and orders of the court. And this shows that this objection cannot be taken advantage of by special demurrer, but should have been made on motion in the early stages of the suit. But there is no law forbidding any attorney to commence a suit, especially such an one as this, in the name of the United States. The act referred to, only declares, that "there shall be a district attorney, whose duty it shall be to prosecute all actions in which the United States are concerned." Here is no prohibition which can support this cause of demurrer. If the court were satisfied, as they were by affidavit, that individuals had a reasonable right to have an action commenced in the name of the United States, they were right in appointing another attorney, on the refusal of the district attorney.

LIVINGSTON, Circuit Justice. This is an action on the case for a misfeasance against the defendant as marshal of the Southern district of New York. The plaintiffs declare, that in September term, 1817, the district court for the district of Maine rendered judgment in their favour against Andrew Ogden, Abraham K. Smedes, and Thomas C. Butler, for 22,361 dollars 75 cents debt or damages, and also for costs, which judgment in part, that is, for 11,180 dollars 87 cents remains unsatisfied. That on the 11th September, 1818, the plaintiffs issued an execution out of said court for this sum, directed to the marshal of either of the districts of the United States, which was delivered to the defendant, being then, and yet marshal of the Southern district of New York, on which he returned that he had seized goods and chattels of the defendants therein named, to the value of the whole sum, which remained in his hands for want of buyers. That on the 28th January, 1819, the plaintiffs issued a second execution, on

which the defendant again returned that the same goods and chattels still remained in his hands for want of buyers. That on the 12th August, 1819, they issued a writ of venditioni exponas, which the next day was delivered to the defendant, who instead of selling the goods and chattels which he had seized, delivered them to Ogden, Smedes, and Butler—for which this action is brought.

The defendant pleads—First, the general issue; and secondly, that Wm. H. Crawford, secretary of the treasury of the United States, pursuant to the act to provide for mitigating or remitting forfeitures, &c. on the 9th February, 1818, did remit under his hand and seal to the said Ogden, "all the right, claim, and demand of the United States, and of all others whomsoever, to the forfeitures for which the said judgment was rendered, upon payment of the duties which would have been payable if the importation had been lawful, and the costs and charges, and on payment of five hundred dollars to be distributed among the custom-house officers in the proportions prescribed by law." That on the 19th December, 1818, the secretary issued a second warrant of remission, the former being thought defective, of similar import with the first, and on the same terms. That after the receipt, and before the return of the venditioni exponas, to wit, on the 1st September, 1819, these warrants of remission were served on the defendant, by Ogden, Smedes, and Butler, who had complied with all the terms therein mentioned, and did demand of him a restoration of the property mentioned in his returns to the executions aforesaid, which was delivered to them accordingly. The plea contains an averment, that the judgment aforesaid was rendered on a bond given for the appraised value of the brig Hollon, and a part of her cargo, by reason of the forfeitures mentioned and intended in and by the warrants of remission aforesaid.

The plaintiffs in their replication to the second plea admit the issuing of the warrants of remission, but say, that at the times of recovering the judgment aforesaid, of issuing the executions thereon, of the seizure, forfeiture, and condemnation of the said brig and cargo, of issuing and serving the said warrants, and of the compliance with the terms thereof, Isaac Ilsley and James C. Jewett were respectively collector and surveyor for the district of Portland and Falmouth, in the district of Maine. That the former, as collector, on the 5th July, 1813, seized the said brig and cargo as forfeited to the United States, for certain violations of law in the said replication mentioned. That on the next day an information or libel was filed in the district court for the district of Maine, against the same, whereupon the bond aforesaid was executed, and on the 27th of May, 1817, a decree passed, declaring the said brig and cargo "to be by law forfeited," and ordering the appraised value thereof to be paid into court in twenty days from the date of the

decree, with costs. That at the September term of the said court, judgment was rendered on said bond in favor of the United States with costs of suit. That the collector and surveyor (there being no naval officer) were entitled to one moiety of this forfeiture, for the purpose of obtaining and satisfying which moiety the aforesaid writs of execution were sued out, of all which the defendant had notice: and the plaintiffs then aver, that this suit, although in their names, is for and in behalf of the said Ilsley and Jewett, and to enable them to recover damages for the injury they have sustained by the misfeasance of the defendant, and not for the benefit or behoof of the United States.

To this replication the defendant demurs, and for causes shows: That the replication is a departure from the declaration, in this: that the declaration proceeds upon a cause of action in favour of the United States, whereas the replication proceeds on a cause of action in favour of Isaac Ilsley and James C. Jewett, and for that the replication disclosed no authority for them to prosecute in the name of the United States; and also for that by reason of the matters disclosed in the replication, the said writs of execution could not lawfully run or be, executed elsewhere than in the district of Maine; and also for that, this action is prosecuted in the name of the United States, by an attorney on record, who is not the attorney of the United States for the Southern district of New York. A joinder in demurrer closes the pleadings.

The expectation of recovering in this action must arise altogether from a supposed want of power in the secretary of the treasury to remit, after sentence of condemnation, such portion of a forfeiture as by law is to be distributed among the officers of the customs. Postponing, therefore, for the present, a consideration of the several causes of demurrer, which have been assigned to the plaintiff's replication, the court will inquire whether, after the remissions stated in the plea, a right of action can exist in any shape for the moiety for which the present one is brought; for if the right, as well of the United States as of the collector and surveyor, be extinguished thereby, it will follow that no action, in any form, or in any name, can be maintained against the defendant for the act here complained of.

It is said, that by a decree of condemnation, a right to a moiety of the value of the goods seized, which before was only inchoate and defeasible, is consummated and becomes so absolutely vested in the custom-house officers, as to place it out of the reach of the secretary of the treasury, whose interference, if it can be exerted at all after such sentence, must be confined exclusively to that part in which the public have an interest. This question is as new as it is important, and it is somewhat extraordinary that it should not have sooner occurred, for it is not known that a decision of it has ever before been

necessary in any federal court. It excited therefore some surprise, to hear mentioned among the leading cases, and one which was treated as little short of conclusive, by the plaintiff's counsel, that of Jones v. Shore [1 Wheat. (14 U. S.) 462]. Whatever language may have been used in the opinion given on that occasion, nothing is more certain, than that this point did not even incidentally present itself. There had been no remission, so that the court's attention was not in any degree drawn to an examination of the secretary's power. To have circumscribed it therefore within the limits now assigned to it, without its being called in question and without argument or discussion, would hardly have comported with the decorum due to so high and confidential an officer of the government, and would have been an unnecessary speculation at best, by which even that court would not have been bound, if the same point had afterwards required its decision. All it had to do, was to adjust the conflicting claims between the representatives of a deceased collector who had made a seizure, and his successor who had come into office before judgment, and of course before the money was received. There was no doubt, without reference to any authority, that the forfeiture in that case was consummated; but a difficulty arose under the collection act, whether the proceeds belonged to the collector in office at the time of rendering the judgment, and the receipt of the money, or to the one by whom the seizure had been made. In reference to that question and no other, it was thought best, there being some ambiguity in the act, to consider the time of seizure as fixing the right, if such seizure were afterwards perfected by judgment, whether such judgment were rendered during the life, or after the death of the officer who had made it.

This judgment proceeded, not more on any consideration, than on the hardship of depriving a collector, who had incurred all the responsibility of making a seizure, and had been exposed to much trouble and expense in its prosecution, of the fruits of his labour, at the very moment perhaps, when a termination of the suit was at hand. The decision is a reasonable one, and yet without any disregard of English authorities, a different rule might very well have been adopted under our act; and one which, as a general and prospective one, would have operated just as well and as equitably between collectors in and out of office. So far, indeed, from its being necessary to express an opinion as to the point of time, after which the secretary's control over a forfeiture ceases, (for the money had already been received,) it is admitted by all the counsel, that the penalty or forfeiture might be released at any time before payment to the collector; and Mr. Penlaney, in defining the word "recovered," on which so much emphasis has been laid on the present occasion, says that it means "adjudged and received." The present case then is entirely

different from the one on which these remarks are made, and can therefore, receive no light whatever from it. But although the supreme court has not settled the present question, there can be no doubt that the circuit court for the Massachusetts district has denied, in terms not to be misunderstood, the power of a secretary to remit, after a sentence not appealed from, any portion of the forfeiture given by law to a collector. Although both the cases of The Margaretta and of The Hollon were disposed of on other grounds, it appears to be the expression of a judgment formed on great deliberation, and therefore entitled to the same high consideration in which all the decisions of that court are so deservedly held; and it is said without affectation, that not until after great hesitation, did this court come to a different conclusion.

It will not be denied that where a subject in England acquires title to a thing forfeited for a crime or misdemeanor, to the king, although he may pardon the offence, so as to arrest the punishment of the party, and remove any disability which has been incurred, yet such act of grace shall not operate to the injury of third persons, so as to deprive them of vested rights. And this is in conformity with a maxim of the common law, "Non poterit rex gratiam facere, cum injuria et damno aliorum." This is, and ought to be so, wherever the forfeiture is to the party aggrieved. It may also be the case in a qui tam action, that a pardon does not discharge that portion of the penalty which goes to the plaintiff. So where the law, as in cases of game,[1] divides the penalty between an informer and the poor, the crown having no interest, a pardon is no bar to the filing of an information. And it may be admitted generally, that wherever an individual has an interest in the thing demanded, distinct from that of the crown, whether by the common or statute law, and in many cases whether a suit has been commenced or not, the king has no power over it. So also in cases of prize, a sentence of condemnation may place the title of the captor beyond the reach of prerogative. That these limitations have taken place in England on the power of the crown, and very naturally and properly, may be conceded, and the plaintiff's title acquire no additional strength from the admission. For before there can be any application here of the principles of these decisions, or any analogy can be shown between the cases cited, either from the courts of common law, or from those of prize, and the one now under consideration, it should appear that the title of the plaintiffs and the power of the secretary to remit, bear some resemblance to the private rights mentioned in the books, and the pardoning power of the crown. The rights acquired in England, and which have been so sedulously and so laudably guarded by the courts of that country, are either derived from the positive provisions of a legislative act, not defeasible on any contingency, or in virtue of the common

law, or in consequence of captures jure belli; whereas the right to which it is expected that the same protection will be extended here, is derived under an act of congress, which, at the very time of conferring it, holds out an intimation in what manner, and by what authority it may be defeated, and be rendered null and unproductive.

Again, the king's right to pardon is a branch of his prerogative, which is exercised independently of any power conferred on him by the act of parliament which creates the offence. All, which the law does, is to declare the crime; to provide for its punishment; and sometimes it annexes a penalty which goes to an informer, or to the party grieved, or to any one who will sue for the same. In all these cases, the law is silent as to any right of the crown to pardon, or as to the extent to which such power shall be exercised. Whenever, therefore, this prerogative, although inherent in the crown, and inseparable from regal dignity, was interposed in the cases which have been put, it was reasonable and to be expected, that courts would restrain it within such limits, as to prevent its infringing on private rights. But does the same reason exist for a similar restriction on the power of the secretary? The right to any part of a forfeiture in a custom-house officer, it is true, is founded on an act of congress. But the same authority as has just been mentioned declares how it shall be asserted, and in what way it may be defeated; so that it is a right, contingent in its very inception. Nor is it in virtue of the pardoning power vested by the constitution in the president, that these remissions take place, which it might then be proper to restrain within the same limits, if it should be attempted to be so exercised as not only to remit the punishment of the offender, but to defeat any private interest which had attached on commission of the act which was pardoned. These forfeitures, on the contrary, are released in virtue of an authority specially delegated to the officer at the head of the treasury. It is a power not only to remove a disability, consequent on some breach of the statute, but more particularly for the purpose, and for which it is more frequently exerted, of mitigating, and remitting forfeitures. And it is not perceived how any citizen can reasonably object to having such a claim submitted to the same responsible officer by whom those of the United States are to be adjudged.

Instead then of recurring to English decisions, which are predicated of a different state of things, and adapted to a different code of laws, we shall probably be led to a more correct conclusion, by looking only at the different acts of congress which have been passed in relation to this subject, and at the practice, which, from an early period to the present day has been pursued under them, without a complaint being heard from any quarter, until the one which has grown out of the present remissions.

A system of revenue laws must necessarily contain so many and such minute provisions, enforced by a coresponding number of penalties and forfeitures, as frequently to subject to difficulties the most upright and wary merchant, and expose his property to seizure and confiscation. That such cases must occur was early foreseen, and yet it was not thought proper to trust any court with the power of acquittal founded solely on the innocence of the party. See The William Gray [Case No. 17,694]. If the tribunal having cognizance of the fact of forfeiture, might also have inquired into the quo animo, a sentence of confiscation would never have been pronounced, if the innocence of the claimant had been made out; and the present difficulty could not have occurred. And in such cases, if by newly discovered testimony his innocence might be made to appear even after judgment, it is perhaps not saying too much, that a court would not have been unwilling (merely because the right of a collector had thereby become absolute,) to stay proceedings on its own sentence, and to vacate it altogether, if justice required it. At any rate, on an appeal, this testimony would be received, and the first sentence reversed.

The legislature, however, has thought proper, in order to arrive at the same end, to prescribe a different course. If the fact be made out, which, by law, produces a forfeiture, a court is bound to pronounce sentence accordingly. But to have left the system here would justly have exposed the American government to the charge of injustice in making no discrimination between the innocent and guilty. Provision, therefore, was made to rescue property which might innocently become liable to forfeiture from the penal sanctions of the law. By the eighty-ninth section of the collection law, the collector is enjoined to cause suits to be commenced for all penalties, and to prosecute them to effect. and is to receive from the court the sums recovered, and on the receipt thereof, is to distribute the same according to law. The ninety-first section of the same act declares, that all fines, penalties, and forfeitures, recovered by virtue thereof, after deducting all proper costs and charges, shall be, one moiety for the use of the United States. and the other moiety for the collector, and certain other officers of the customs. This act passed March 2, 1799. The first act regulating the collection of duties and containing a similar provision, passed 1st September, 1789 [1 Stat. 55].

Both these laws require of the court. where the prosecution is depending, to hear and determine the cause according to law; which can only mean. that if the fact which works a forfeiture be proved, the court must decide without reference to the innocence of the person to whom the forfeited article belongs. From 1789 until 1797, no mitigating control was vested any where, unless

the same resided in the president in virtue of his own constitutional right to grant reprieves and pardons for offences against the United States; and if under this authority these remissions had taken place, it might with reason be contended, even in the absence of any adjudged case that he could not, either before or after judgment, release the shares of the public officers. On the 3d of March, 1797, after the hardships and injustice of the existing system must have been felt, in leaving liable to sequestration, property whose owner had been guilty of no wilful neglect or fraud, the legislature for the first time, conferred on the secretary of the treasury the power in question. An act which then passed [1 Stat. 506], authorizes him in a mode therein prescribed, to mitigate, or remit altogether, any fine, forfeiture, or penalty, or any part thereof, if in his opinion the same shall have been incurred "without wilful negligence or any intention of fraud, in the person or persons incurring the same," and to direct the prosecution, if any shall have been instituted for the recovery thereof, to cease and be discontinued, upon such terms or conditions as he may deem reasonable or just.

As this act was the first of the kind which had been passed, and not until the law for the collection of duties had been in force for several years, during which period many seizures for forfeitures had been made, it very properly contained a proviso, to prevent its affecting private rights or claims to any part of such forfeitures, in case a prosecution had been commenced, whether judgment were passed or not, before the passage thereof, or of any other act relative to such mitigation. This proviso, while it bespeaks a solicitude in the legislature not to interfere with vested rights, shows that all claims founded on seizures made after the passing of such laws, were to be subject to the secretary's examination, precisely in the same way with those of the United States. This act. which was temporary, was made perpetual by a law passed the 11th February, 1800 [2 Stat. 7].

It is impossible to peruse these acts without assenting at once to the liberality and justice of their provisions; nor can we forbear remarking that no limit is any where prescribed to the secretary's power, as to the time when it shall be exercised, other than that it must be during the prosecution. The legislature thought it a sufficient spur to the interest. and an ample remuneration for the vigilance and labour of the customhouse officers. to leave undisturbed their participation in the fruits arising from every criminal violation of law (if such expressions may be used). But to permit them to divide the property of an unfortunate and innocent merchant, was considered as at war with the first principles of morality and justice. When a claim, therefore, of this nature is asserted, no court can be blamed for

looking at it with more than ordinary jealousy, nor for withholding its sanction so long as a reasonable doubt of its validity shall remain. If goods are unladen from a vessel without a permit, of the value only of four hundred dollars, the vessel, whatever it may be worth, is absolutely forfeited. Now, after the government is satisfied of the entire innocence of the owners, and has remitted the whole penalty under a law in force at the time of seizure, can it be endured that a collector shall be permitted to enforce his title to any part of it, merely because, after a few proclamations, rapidly succeeding each other, a court has declared, which was never disputed, that a forfeiture had taken place? Is it right, is it just, is it honest, that it should be so?

Rather than lay hold of a technical term, which, after all, may not have been used in such sense, in support of a claim which has so little to recommend it, every disposition will be felt to give the law, if it can be done without a palpable violation of duty, such an interpretation as will best promote the benevolent and equitable intentions of the legislature, and will extend relief to every portion of the property, so long as it has not been converted into money, and paid to the collector. It will not readily fetter itself with cases of doubtful application, nor consider a pardon and a remission under this act as convertible terms, nor impose on the latter the same restrictions and limitations which it has been thought proper to prescribe for the former. A pardon, as the very term imports, is an act of mercy and favour, and generally supposes its object guilty. A remission, on the contrary, is an act of justice, and cannot be obtained, until the entire innocence of the petitioner be established, not by testimony taken ex parte, but after full notice to the proper officer of the government, and to the collector who made the seizure.

But it is said, that after a recovery, that is, after sentence of forfeiture, the power of remission may still apply to the share of the government, but cannot be exercised over the part claimed by the collector and his associates. No such distinction is found in the act. If such sentence be a bar to an interference with the share of these officers, it is not perceived why it should not also withdraw the case from the secretary's cognizance, as it regards the interest of the public; for he has no better or larger right to release the latter, than the former. But is the term "recovery," on which so much stress is laid, of so much value and effect, and so very appropriate and inflexible in its meaning, as necessarily and absolutely to be limited in its signification to the time of rendering judgment, and susceptible of no other signification whatever? The court feels no obligation to attach so much importance to this term. In the formal and solemn language of a common law record, it

is considered that a party recover, and if the legislature had been speaking of proceedings in courts of common law only, and no light had been afforded by other parts of the act, some argument might have been drawn from the use of that word. But as most of the proceedings to which this power applies are necessarily in rem and in the admiralty, in whose judgments or decrees in such cases this term never occurs, there is no reason for applying to it any other than its popular, ordinary, and vulgar meaning, which is to regain the possession of something which may have been lost or taken away, or to reduce to actual possession something to which we have or may assert a claim. Now a judgment has no such effect; it does not put the party in possession of the thing claimed. Nothing, therefore, is recovered within the meaning of this law, until it is "adjudged and received."

But this is not the only term used by which the secretary's power is to be tested. He is to direct the prosecution to cease and be discontinued. Now a prosecution in legal or common phraseology, is not at an end so long as an execution be necessary to produce the fruits of it. It is the last, but a very important step, and one which must take place if no settlement intervenes, and be actually executed before there is an end of the prosecution. If then the secretary may direct a prosecution to cease, what right can a court have to limit his power to one stage of it, more than to another?

Under the interpretation contended for by the plaintiffs, it would be very difficult in many cases to obtain a remission, however good a title the party might make out, for more than a moiety, and perhaps not even for so much. A court is not bound, on the appearance of a petition, to stay its proceedings on the libel. What then is an innocent man to do? He cannot deny the forfeiture, and if he does, witnesses are at hand to prove it. In this dilemma he presents his petition, but before the facts can be proved, stated, and transmitted to the treasury, or before the secretary has pronounced judgment on them, a sentence passes, after which, if a remission come, he must be content to lose the one half, if not the whole of his property; not because its value has been received by the collector, but because the sentence has ascertained what was admitted from the beginning, that a forfeiture had accrued. In this very case sentence was pronounced, as appears by the decree itself, without even a claim being filed, and while a petition for remission was lying in the secretary's office. But at what epoch, it is asked, is this power to cease? Shall it extend even to the money after it has been received and distributed? When a secretary shall act at so late a period as is here put, it will be time enough to decide whether he has not transcended his authority. If it be admitted that such an exercise of power

would be extravagant and illegal, it will not follow that prior to a receipt of the money, it may not legitimately be exerted over the whole subject.

This view of the act derives much support from the uniform practice of the treasury. It is believed that every secretary has remitted the whole of a forfeiture even after condemnation, and it is not known that his right so to do has, until very recently, been called in question. Considering the character and acknowledged legal talents of the gentlemen who have successively been at the head of this department, a court may acquiesce in an interpretation which they have given to the act, without much danger of falling into error. Nor can such remission be regarded as a mere ministerial act. It partakes much of a judicial character. It cannot be made but on evidence regularly taken, so that his act in deciding on the innocence of the claimant is as much a judicial one, as is that of the court in pronouncing on the fact of forfeiture. Perhaps after all, as the secretary has jurisdiction of the matter, he had better be regarded not only as the proper person to afford relief, but as the sole judge of the extent of it, and of the time after which it cannot be granted.

Upon the whole, the opinion of the court on this part of the case is, that as a seizure is made, with full knowledge in the collector of this power in the secretary, he cannot be regarded as aggrieved by its exercise, so long as the property, or the bond given for its value, remain in possession of the court, and the money has not been received by the collector.

The special cause of demurrer will now be disposed of. The first cause assigned is, that the replication is a departure from the declaration, in as much as the latter proceeds upon a cause of action in favour of the United States, whereas the replication discloses a cause of action in favour of Isaac Ilsley and James C. Jewett. A departure in pleading takes place, when a second plea contains matter not pursuant to the former, and which does not fortify the same,—with perhaps this qualification,—that if a matter be pleaded which could not have been shown or stated in the former plea, such new matter will not always be a departure. It is certain that courts, to avoid multiplicity in pleading, reluctantly admit any matter to be alleged in a subsequent plea, which might have been sooner set forth. Thus, in a præcipe quod reddat, if the tenant plead that the land was devised to him, and the plaintiff reply infancy, the defendant cannot rejoin, that by custom infants may devise; this being a departure; because he ought, as the court say, to have pleaded this matter in the first instance. If performance of covenants be pleaded, and the plaintiff replies that the defendant did not do such an act according to the covenant, the defendant cannot in his rejoinder say that he offered to do it, and the plaintiff refused—for the tender and refusal should have been set forth in the plea. A defendant pleaded in bar a lease for 50 years, made by a corporation, and afterwards in his rejoinder, pleads a proviso in a statute, which makes such leases good for 21 years,—this was also, and for the same reason, adjudged a departure. It is given as a rule in Doctrina Placitandi that if a general matter be pleaded, where the special matter might have been pleaded, the party shall not maintain the general with the special matter. Nor is the rule, which in the case of new matter being alleged, permits the other party also to allege new matter in avoidance of it, at variance with the one just mentioned; for if the new matter here intended, be something which the party against whom it is alleged had no opportunity of knowing before, the one rule will consist and be in harmony with the other. In later times the same rule has been recognised and enforced. In Willes, 639, the defendant in trespass pleaded his taking the cattle, damage-feasant, and in his rejoinder, for a surcharge of common. The court thought this a departure, as the surcharge might have been pleaded at first. In answer to these cases, it is said that an assignee of a chose in action may sue at law in the name of the assignor, and that if an obligor plead a release from the obligee in whose name the action is brought, executed after notice of the assignment, a replication which states such assignment and notice will be good. This may well be, for non constat that the assignee had any notice of the release until it was pleaded; or it may be allowed in this way, to allege a fraud in the defendant, which defeats his bar. Without inquiring whether courts of law would not have done better to leave assignees to the exclusive protection of a court of equity, it is sufficient to remark that the new matter set forth by the plaintiffs in their replication was not only in their knowledge at the time of filing their declaration, but was the very ground on which they expected to render the marshal liable; and that so far from fortifying their declaration, it shows that the United States, who are plaintiffs on record, have not only no interest in the action, but that they have done all they could do to release the same. Nor is this new matter alleged with the view of setting aside the defence on the ground of any fraud in the United States or their officer. The court is of opinion that the first cause of demurrer is good.

The second is, that no authority is disclosed by the replication to prosecute in the name of the United States. It has been attempted to avoid the force of this objection by considering the real plaintiffs in the character of assignees of the judgment, although no assignment is set forth, nor is it pretended that any exists—or by regarding the United States as trustees for the collector and

naval officer, who have, therefore, a right to use their name. It will be going further than has yet been gone, for a court of law to consider persons in the situation of their collector and naval officer as assignees of a judgment, or the United States as trustees for their use, merely because, if the money had been received, they would have been entitled to a share of it. But if the United States were their trustees, and they have released the judgment, it is no reason why the cestui que trust should not be bound at law by such release, as no fraud can be supposed in the government or its officer, nor is any pretended. It is not fit, after such an overt act on the part of the United States, to permit individuals who may think themselves injured by it, to enforce in their name, and that too in a court of common law, a demand which they may suppose themselves to have against the marshal for giving effect to such release. If they have been injured by the officer, for it is against him that a recovery is sought, it is better to force them to sue in their own name, if they have any cause of action, than to embarrass the record with legal and equitable interests, which must always be more or less productive of confusion and embarrassment. Nor should a party lightly be permitted to avail himself of the advantage of suing in the name of the United States, when the action is brought exclusively for his own benefit, and he can sue if his claim be a good one, in his own name. Nor should any facility in a case like this be afforded, if not a matter of strict right, to sue a public officer in the name of the United States, when it appears that the only demand, if there be any, arises out of his obedience to the mandate of an officer designated by law to act in the premises.

Another cause of demurrer is assigned which the court is also strongly inclined to consider a fatal one. It is the one which arises from a disclosure of the fact in the replication that the writs of execution which issued from the district court of Maine, were for the sole benefit of Ilsley and Jewett, and it is therefore asked what right these gentlemen had to direct an execution to any other but to the marshal of that district. Executions on judgments in courts of the United States obtained for their use, may run into any district or territory. This is a high privilege, to enable the government to collect their debts with greater facility than other creditors, and is therefore carefully confined to such cases alone. If then, the court cannot regard the interests of Ilsley and Jewett, so far as to permit them to sue in the name of the United States, they ought not to object to their being considered for every other purpose as the real and only parties whose rights are to be protected; and then, whence is derived their title to send into this district an execution on a judgment obtained elsewhere, and in which at the time of its issuing they admit the public had no interest whatever? In answer, it has been said, that the judgment being originally for the use of the United States, the terms of the act are satisfied. This may be, and being never very solicitous to construe an act by its spirit, where it can be avoided, this point, although not free from doubt, will be left undecided: and yet, if ever an act were done contrary to the manifest intention of the legislature, it is the one we are now examining, and never was there a fitter occasion for applying the maxim of "cessante ratione, cessat et ipsa lex."

The court will also leave undecided the question whether an action will lie for an individual for a tort done to the United States by a marshal, in not executing a writ issued in their favour, because such individual may consider himself aggrieved thereby in consequence of some interest he may have, or suppose himself to have, in such process.

The last cause of demurrer assigned, which the court also considers as a good one, is, that the action is prosecuted in the name of an attorney who is not district attorney, to whom is exclusively confided the conduct of actions in which the government is interested. The only answer we have heard to this objection, which is not a sufficient one, is that non constat that the attorney on record is not the district attorney. The court judicially knows this officer—his commission is shown to it—he acts in presence of the court in all criminal prosecutions, and on all occasions where the interests of the United States are concerned; and whenever he does appear on record, it is in his official character. The court, therefore, can and ought to take notice of such an objection whenever its attention is drawn to the fact; and although it may not in ordinary cases, unless under special circumstances, call for the production of any authority for an attorney of this court to appear in a particular suit, yet knowing that the United States have an attorney of their own, no other should merely at the instance of an individual be permitted to act in his place.

It should be mentioned here, that the gentleman who appears on the record as attorney for the plaintiff, was appointed by the court, under an impression that in some cases an individual might have a right to prosecute in the name of the United States, in which if the district attorney refused to appear, the court might empower some one to act in his stead. Whether this be correct or not, the court is now satisfied that the district attorney was right here in refusing to act, and that the real plaintiffs, if there be any cause of action against the marshal, should have sued in their own names. A suggestion was made, although it did not appear to be relied on, that these very questions, or some of them, had been decided by the district court of Maine and between these same parties. If so, such judgment should have been spread on the record; but.

in looking at the proceedings of that court on the petition of Ogden, Smedes, and Butler, it does not appear on what ground the prayer of it was rejected, and most certainly several of the questions which have been made here, could not have occurred on that occasion.

Judgment must be entered for the defendant.

[This judgment was affirmed by the supreme court. 10 Wheat. (23 U. S.) 246.]